IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| ALYSSA CLARE HOWELLS, | ) | |
| Plaintiff, | ) | Civil Action No. 3:15-cv-68 |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| NANCY A. BERRYHILL, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Alyssa Clare Howells asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). ECF No. 8. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's decision is supported by substantial evidence.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the

burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Howells applied for DIB and SSI on November 9, 2011, alleging disability caused by bronchiolitis obliterans,[1] depression, anxiety, and psoriatic arthritis. Administrative Record ("R.") 96, 107, ECF No. 12. At the time of her alleged onset date of March 15, 2011, she was twenty-eight years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied her claims at the initial and reconsideration stages. R. 96–117, 120–47. On February 28, 2014, Howells appeared with counsel at an administrative hearing before ALJ Mark A. O'Hara, at which time the ALJ heard testimony from Howells and Robert Jackson, a vocational expert ("VE"). R. 39–95.

ALJ O'Hara denied Howells's claims in a written decision issued on April 15, 2014. R. 8–33. He found that Howells had severe impairments of obesity, bronchiolitis obliterans, asthma, spine disorder, and psoriatic arthritis. R. 11. He determined, however, that the other impairments established in the record, including Vitamin D deficiency, polycystic ovary syndrome, history of right shoulder fracture status post surgery, and Howells's mental impairments, were nonsevere, and that none of her impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 11–14.

As to Howells's residual functional capacity ("RFC"),[2] the ALJ found that she could perform light work,[3] further limited to six hours of sitting and four hours of standing or walking

---

[1] Bronchiolitis obliterans with organizing pneumonia is a condition in which the "terminal bronchioles and alveoli [airways and gas exchange sacs] become occluded with masses of inflammatory cells and fibrotic tissue." *Dorland's Illustrated Medical Dictionary* 252 (32d ed. 2012); *see also* R. 11 n.2.

[2] A person's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

3

in an eight-hour day; unlimited balancing; frequent stooping, kneeling, crouching, and climbing of stairs or ramps; occasional crawling and climbing of ladders, ropes, or scaffolds; and avoiding even moderate exposure to respiratory irritants. R. 14–31. Based on this RFC and the VE's testimony, the ALJ found that Howells could not return to her past relevant work, but could perform other work existing in the national and regional economies, including light jobs such as non-USPS mail clerk and counter rental clerk, as well as sedentary[4] jobs such as inspector/grader and assembler. R. 31–32. He therefore concluded that Howells was not disabled. R. 33. The Appeals Council denied Howells's request for review, R. 1–3, and this appeal followed.

### III. Discussion

Howells contends that the ALJ erred by failing to assess whether her documented history of migraine headaches constituted a severe impairment and, accordingly, whether additional limitations should have been included in her RFC. Pl. Br. 4–16, ECF No. 16.[5] In addition, she argues that the ALJ improperly weighed the opinion of one of her treating physicians when assessing her RFC. *Id.* at 16–37.

A. *Migraine Headaches*

 1. *Relevant Evidence*

---

[3] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if she also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

[5] Howells also argued in her brief that the ALJ erred by failing to consider whether her migraines met or medically equaled a listed impairment, *id.* at 11–14, but conceded at oral argument that this contention was not viable.

The record documents Howells's complaints of migraines as far back as April 27, 2008, at which time she reported to the University of Virginia ("UVA") hospital with what she described as the "worst headache of her life." R. 533–34. Howells stated that she had woken up with a headache the night of April 23, gone to the UVA Emergency Department the following day, and was treated with Benadryl and Toradol, which resolved the headache for a few hours before it returned and persisted for the next several days. *Id.* Associated symptoms included photophobia, phonophobia, nausea, blurred vision, generalized fatigue, and difficulty with word finding. R. 534. Imaging and test results were all normal, and she was discharged with instructions to follow up with outpatient treatment. R. 530. She returned to UVA on June 3, stating that her headache had not abated since her discharge, and she was treated with several courses of IV dihydroergotamine ("DHE"), which completely relieved her symptoms. R. 530–32.

Howells reported to the UVA Emergency Department again on May 5, 2010, complaining of a particularly severe migraine headache accompanied by nausea, phonophobia, photophobia, and visual disturbances. R. 511–19. She stated that she typically got one to two headaches per month and that they usually responded to Imitrex. R. 517. Doctors noted that her previous workup for pseudotumor cerebri was negative. *Id.* On examination, neurological signs were all normal. R. 518. She was treated with a combination of IV medications and discharged in stable condition. R. 514.

On December 6, 2011, Howells visited with Bryan Cupka, M.D., a neurologist at UVA, for follow-up treatment of her headaches. R. 542–46.[6] She reported that she had been experiencing daily headaches since she started taking Humira for her arthritis a month earlier. R.

---

[6] Dr. Cupka noted that Howells had last visited his clinic in February 2011 and reported doing well on Topamax and Imitrex. R. 542. The record contains no report from this encounter.

5

542–43. Howells described these headaches as dull, lasting less than the whole day, and not accompanied by her typical migrainous symptoms. R. 543. She also explained that her migraines had become more frequent: they used to occur once per month, but she now experienced them once per week, although Imitrex relieved her symptoms four out of five times. *Id.* On examination, Dr. Cupka noted right greater than left anisocoria; decreased sensation on the left in the V1-V3 distribution, first and second digits, and upper arm; and resting tremor worse with intention in her bilateral hands. R. 544–45. Other signs were normal, however, including intact extraocular movements, visual fields full to confrontation, no signs of increased intracranial pressure, no dysarthria, full strength and reflexes in all extremities, and normal coordination and gait. *Id.* An MRI of her brain, taken several days later, showed no evidence of intracranial abnormality. R. 636.

Dr. Cupka opined that Howells's migraines were likely exacerbated by recent stress, and he noted that at baseline she kept these under good control by taking Topamax regularly and Imitrex at the onset of her headaches. R. 545. He added a prescription for tizanidine to improve her sleep and relieve the tension component of her headaches. *Id.* He also assessed that Howells's daily headaches could be caused by Humira. *Id.* This opinion seemed to be validated when, at a January 23, 2012, visit with Janet Lewis, M.D., her rheumatologist at UVA, Howells reported that she had stopped taking Humira about one month earlier and her daily headaches had since resolved. R. 655.

Howells returned to Dr. Cupka on March 29 for follow-up. R. 852–55. She again reported that her daily headaches went away after discontinuing Humira, and she stated that she still experienced three to four migraines per month, which would normally responded to Imitrex, but could last for two days on the rare occasions that medication did not work. R. 852. She had no

6

side effects from Topamax. *Id.* She also reported that she had begun experiencing new visual disturbances, which she did not feel were similar to her migraines, and "spells" involving whole-body tremors. R. 852–53. Her neurological examination was fully normal except for bilateral hand tremor with holding her arms out, which improved with intention. R. 854–55. Dr. Cupka reiterated that Howells's migraines appeared to be under good control and stated that she could increase her dose of Topamax if they got worse. R. 855. As to her tremors, Dr. Cupka expressed skepticism that these had a neurological basis, but rather that they may be an exaggerated physiological tremor related to Howells's anxiety, medications, or other illnesses. *Id.* He was uncertain of the etiology of Howells's visual changes, but noted that they seemed separate from her migraines. *Id.*

Howells next visited the UVA Neurology Clinic on September 13 and was evaluated by Stephen Donahue, M.D. R. 782–84. Dr. Donahue noted that Howells's episodic migraines were well controlled by Topamax and that when these occurred (which she said happened once per week), Imitrex "wipe[d] her headaches out 95% of the time." R. 782. Howells expressed concern that Topamax could be causing her to experience word-finding difficulties, but she was not interested in discontinuing this medication because it was so helpful in controlling her headaches. *Id.* On examination, her neurological signs were fully normal. R. 783–84. Dr. Donahue continued Howells's medications, stating that Topamax was effective as a preventive agent and Imitrex was effective as an abortive agent, but he considered the possibility of switching from Topamax to another drug in the future if Howells's issues with word-finding continued. R. 784.

At an October 5 visit with Mary Preston, M.D., her primary care provider, R. 764–68, Howells complained that she was experiencing more migraines and was under greater stress. R.

7

764. She reported that her neurologist had suggested she increase her dosage of Effexor,[7] although Dr. Preston could not corroborate this suggestion. *Id.* During the review of systems, Howells expressed some difficulty with word finding, R. 767, which Dr. Preston thought could be attributed to increased stress, R. 768. Pertinent findings on physical examination were normal. R. 767–68. Dr. Preston increased Howells's dose of Effexor with the thought that it might help her migraines. R. 768. One month later, at a visit for an assessment of back pain, Dr. Donahue documented normal neurological findings on examination and noted that Howells's migraines were under pretty good control. R. 752.

On January 17, 2013, Howells was admitted to the Emergency Department at UVA for treatment of a headache she had experienced over the past eight days. R. 1156–60. Her headache was sharp, left-sided, and had increased in intensity since its onset. R. 1156. She reported that her headache was preceded by a strong bout of dizziness and associated with nausea, phonophobia, and left eye pain, but she did not experience photophobia. *Id.* Although she stated her migraines typically caused stuttered speech and difficulty with concentrating or reading, these symptoms were not present on this occasion. *Id.* She also denied weakness, numbness, or loss of sensation. *Id.* She had been treated with Benadryl and Reglan several days earlier, but these did not help to reduce her headache. *Id.* At that time, doctors told her that she had reduced strength on the right side. *Id.* Although she reported that Imitrex normally broke her migraines, she had not taken it this time. R. 1157. Her headache subsided after several courses of DHE, and neurological signs were normal on examination at discharge on January 21. R. 1156–58.

Howells visited Dr. Preston on September 13 for follow-up regarding her migraines. R. 1216–20. She reported that she experienced her usual migraines twice per month and they responded well to Imitrex, but she had begun to experience one the night before that was not

---

[7] Dr. Preston had prescribed Effexor in May 2012 for treatment of Howells's depression. R. 832.

responding to medication. R. 1217. Dr. Preston noted that Howells appeared distressed, but she was fully oriented and had no focal deficit. R. 1220. All other findings on examination were normal, and Dr. Preston prescribed a one-time injection of Toradol. *Id.* The medical record thereafter is silent as to Howells's migraines.

At the hearing before ALJ O'Hara, Howells testified that she experienced two migraines per week that lasted about one day on average. R. 68–69. She stated that she could not take Imitrex for every migraine, but did take it about four times per month, and that it usually made the migraine go away in about a day. R. 69–71. Asked whether absences from work (presumably brought on by her migraines) would affect her employment prospects, the VE testified that the general tolerance for absenteeism among employers was one day missed per month, but any more frequent absenteeism would preclude employment. R. 93–94.

*2.    Analysis*

Howells contends that the ALJ committed reversible error by failing to determine at step two whether her migraines were a severe impairment.[8] The parties do not dispute that the record establishes that Howells suffered from migraines, but they disagree as to whether the ALJ needed to assess whether they were severe. At step two, the ALJ determines whether a claimant has a "severe medically determinable physical or mental impairment . . . or combination of impairments." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

> [A]n impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.

---

[8] At oral argument, the Commissioner suggested that the ALJ's finding that "all other impairments found in the record" were nonsevere, R. 11, was sufficiently broad to include any impairments that were not specifically enumerated, including Howells's migraines. This reading overlooks the need for the ALJ to make findings that are sufficiently specific to allow to Court to undertake meaningful review.

SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1520(c), 404.1522(a), 416.920(c), 416.922(a). This determination "requires a careful evaluation of the medical findings that describe the impairment(s) . . . and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *2.

The Commissioner argues that an ALJ's step-two assessment is merely a threshold finding; thus, as long as the ALJ correctly identifies the existence of a single severe impairment and proceeds to step three, it does not matter whether he assesses the claimant's other impairments as severe. *See* Def. Br. 14–15, ECF No. 18. This argument goes too far. The ALJ's analysis at step two does not stand in isolation, but rather should be consistent with the other findings in his opinion, including the claimant's RFC. *See Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) ("[T]he hypothetical question . . . must include those [impairments] that the ALJ finds to be severe."); *Jones v. Comm'r of Soc. Sec.*, No. 2:13cv5, 2014 WL 1584352, at *10 (W.D. Va. Apr. 21, 2014) (finding that the ALJ erred by failing to include any limitation in his hypothetical to the VE relating to the claimant's carpal tunnel syndrome despite having found that this was a severe impairment); *cf. Mascio v. Colvin*, 780 F.3d 632, 637–38 (4th Cir. 2015) (noting that the hypothetical and RFC must be consistent with the ALJ's findings at the earlier steps). Where, as here, the claimant alleges that a medically determinable impairment gives rise to functional limitations that are different in kind from those imposed by her other severe impairments, the ALJ needs to consider whether that impairment is severe. The ALJ's failure to do so was in error.

The inquiry does not end here, however. When an ALJ has found at least one severe impairment, any failure to find another impairment severe may be harmless if the ALJ considers

10

all of the claimant's impairments in assessing how much work a claimant can still do. *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011); *Carpenter v. Astrue*, 537 F.3d 1264, 1265–66 (10th Cir. 2008); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Powell v. Astrue*, 927 F. Supp. 2d 267, 274–75 (W.D.N.C. 2013).[9] Reviewing the ALJ's opinion as a whole, it is clear that any error at step two was rendered harmless by his discussion of Howells's migraines in the RFC analysis. The ALJ thoroughly and accurately recited the medical evidence of record, including the evidence regarding Howells's history of migraines. *See* R. 16–28. Moreover, he discussed his reasons for finding that Howells's claim of suffering from two migraine headaches per week, lasting one day or longer, was not fully credible. R. 29. He noted that Howells repeatedly told physicians that she experienced migraines less frequently than this and that when they occurred they were well controlled by Imitrex. *Id.* He also observed that Howells's daily headaches seemed to be medication-related, as they quickly resolved upon discontinuing Humira, rather than her chronic migraine issues. *Id.*

This reasoning is well supported by the record. Howells informed her physicians, including her neurologists, that she effectively controlled her migraines using Topamax as a prophylaxis and Imitrex[10] as an abortive agent. Rather than having migraines twice per week, Howells generally told her doctors that she experienced headaches three or four times per month

---

[9] At oral argument, Howells pointed to the Fourth Circuit's recent decision in *Patterson v. Commissioner of Social Security Administration*, 846 F.3d 656 (4th Cir. 2017), as an example of a case in which the ALJ's error at step two was not harmless. That case is inapposite here because its sole concern involved the ALJ's failure to apply the "special technique" required by the regulations unique to evaluating mental impairments, as opposed to any error regarding physical impairments such as migraines. *See id.* at 660–63.

[10] Howells asserted at oral argument that although Imitrex helped to break her headaches, it also made her excessively drowsy for the entire day, and would therefore still cause her to miss work. The record does not contain any reports of such side effects. Treatment notes documented that Topamax did not cause side effects, R. 852, although it may have contributed to Howells's occasional difficulty with word-finding, R. 782, which also may have been caused by stress.

at most. Moreover, she repeatedly stated that it was only on rare occasions that Imitrex did not break her migraines once they began. Notably, she stated at her most recent hospitalization for migraines that she had not taken Imitrex on that occasion. With her condition well controlled by medications, there is little reason to suspect that she would be forced to miss more than the customary allowance, identified by the VE at the administrative hearing, of one day of work per month. *Cf. Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (explaining that it is well settled that a symptom is not disabling if it can be reasonably controlled with medication or treatment). I therefore find that although the ALJ should have made a determination at step two as to whether Howells's migraines were severe, he adequately explained his rationale for finding that they would not impose limitations beyond those set forth in his RFC. Accordingly, his error at step two was harmless.

B.   *Opinion Evidence*

Howells also contends that the ALJ erred in rejecting the medical opinion issued by Dr. Lewis, her treating rheumatologist. In a checkbox form completed on December 13, 2012, Dr. Lewis opined that Howells could work for less than two hours per day. R. 729. Dr. Lewis found that she could stand for less than two hours and walk for less than two hours, but offered no opinion as to her capacity for sitting. *Id.* Additionally, Howells could lift or carry less than ten pounds for five to six hours of the day, experienced pain and fatigue that interfered with her capacity for full-time work, needed frequent changes of position and frequent rest periods throughout the day, and was limited in her ability to bend. *Id.* Dr. Lewis opined that these limitations resulted from Howells's impairments of psoriatic arthritis, chronic low back pain caused by degenerative disc disease, right hip pain, and shortness of breath caused by asthma and bronchiolitis obliterans. *Id.* Dr. Lewis also noted that she had been treating Howells since March

12

2006 and that Howells's symptoms had been ongoing since 2003, with her lung issues worsening in the spring of 2011. R. 730. The opinion does not include any additional commentary.

    *1.     Dr. Lewis's Treatment Notes*

The first treatment note in the record from Dr. Lewis is of a September 22, 2011, follow-up visit regarding Howells's arthritis. R. 570–72. Dr. Lewis noted that since her last visit, Howells had undergone a lung biopsy that showed she had bronchiolitis obliterans, which her pulmonologist suspected may have been caused by Remicade, a medication she had used to treat her arthritis. R. 570.[11] In addition to her pulmonary difficulties, Howells complained of increased joint pain that was most bothersome in her hands, fingers, and right knee, which had also been swelling. *Id.* She claimed that her morning stiffness lasted for about one hour, and she also stated that she experienced pain in her upper back. *Id.* On examination, she exhibited normal breath sounds, no respiratory distress, no wheezes, and no rales, and she had no abdominal distension. R. 572. She had normal musculoskeletal range of motion and no edema. *Id.* Her knees were positive for crepitus, and her right knee was warm with moderate effusion. *Id.* A joint assessment chart noted no synovitis or tenderness in any of her joints. *Id.* Dr. Lewis discontinued Remicade and planned to start Humira, depending on how Howells responded to steroid treatment for her lungs. *Id.*

Howells next visited Dr. Lewis on November 3. R. 554–57. She had been taking prednisone daily for bronchiolitis obliterans and had not noticed any change in her shortness of breath. R. 554. She reported pain in her right knee with swelling, along with pain in her left knee, back, left shoulder, and hips. R. 554–55. She experienced morning stiffness lasting for one and a

---

[11] Dr. Lewis's descriptions of Howells's respiratory condition are consistent with the contemporaneous assessments of her pulmonologists, who noted some difficulty breathing, but generally found Howells's condition to be stable and reasonably controlled with medications. *See* R. 539–41, 559–61, 573–75, 666–68, 743–45, 769–71, 785–87, 811–14, 837–40, 862–65, 1196–97.

13

half hours. R. 555. On examination, she again displayed normal pulmonary signs, normal range of motion, no edema, crepitus of the knees, and warm right knee with moderate effusion. R. 556. Her joint assessment was positive for synovitis and tenderness of the right knee, but otherwise was negative throughout. R. 556–57. Dr. Lewis noted that Howells's psoriatic arthritis was suboptimally controlled despite taking prednisone for her lung condition, and she started Howells on Humira. R. 557.

On January 23, 2012, Howells told Dr. Lewis that she felt her joint symptoms had gotten better on Humira, but she had discontinued it about a month earlier out of concern that it caused her daily headaches. R. 655–58; *see also supra* Pt. III.A.1. Since she stopped taking Humira, her arthritis symptoms had worsened, with morning stiffness lasting for two hours and pain in her hands, lateral hips, knees, ankles, and feet. R. 655. She also reported that she had developed a cough and worsening dyspnea. *Id.* Examination findings were unchanged from her prior visit. R. 656–57. Although the joint assessment chart still showed synovitis in Howells's right knee, Dr. Lewis stated elsewhere in her report that she did not have synovitis on examination. R. 657. Dr. Lewis planned to start a trial of a new TNF inhibitor for Howells's arthritis once her respiratory symptoms normalized. *Id.*

On March 29, Howells reported to Dr. Lewis that she was having a hard time with her arthritis, with particularly bad pain in her lateral hips as well as in her knees, fingers, and ankles. R. 845–48. Howells did not have joint swelling, her morning stiffness lasted for much of the day, and she had trouble getting comfortable while sitting or lying down, but sometimes felt better with activity. R. 846. Dr. Lewis's examination findings remained unchanged except her knees were cool and without effusion, and she again recorded conflicting descriptions of whether she

14

observed synovitis. R. 847–48. Dr. Lewis decided to retry Enbrel, which Howells had used in the past, for treatment of her arthritis. R. 848.

Howells visited with Dr. Lewis again on May 10, stating that she had not yet noticed any improvement of her joint symptoms on Enbrel. R. 833–36. She stated that the pain in her hips had gotten worse and interfered with her sleep; she experienced a sharp, throbbing, shooting pain in her kneecaps; and she had pain that came and went in her fingers, wrists, and ankles. R. 833. Howells described morning stiffness lasting about two hours and gelling with inactivity. *Id.* She also stated that her breathing was still poor, and Dr. Lewis noted that her pulmonologist thought that these respiratory issues were largely attributable to her asthma. *Id.* Findings on examination were unchanged, and Dr. Lewis added Neurontin to help Howells with her pain and difficulty sleeping. R. 835.

On July 23, Howells told Dr. Lewis that her arthritis had improved, but she still experienced pain in her hip, which was worse when she walked and caused her to constantly move to get comfortable. R. 803–06. Howells's pulmonologist had ordered an X-ray of her hip, which was normal. R. 803; *see also* R. 1075. Howells discontinued Neurontin because she believed it was not helping. R. 803. She reported that she still had difficulty with her respiratory issues and experienced dyspnea while taking a shower. *Id.* She had stopped taking prednisone and started taking azithromycin for her bronchiolitis obliterans. *Id.* Findings on examination were once again normal, with no noteworthy respiratory signs, normal range of motion, no edema, no tenderness or synovitis, and crepitus in the knees with no effusion. R. 805–06. She had fair flexion, internal rotation, and external rotation of her right hip, and she was not tender over the greater trochanter. R. 805. She did experience anterior groin pain with extension, however. *Id.* Dr. Lewis noted that Howells's arthritis was under fair control and continued her on

15

Case 3:15-cv-00068-JCH   Document 27   Filed 03/31/17   Page 15 of 20   Pageid#: 1499

Enbrel. R. 806. As to her hip pain, Dr. Lewis assessed a differential diagnosis of avascular necrosis, tendonitis, and radicular pain. *Id.* An MRI taken three days later showed no evidence of avascular necrosis, and osseous and soft tissue structures appeared within normal limits. R. 1071.

Howells saw Dr. Lewis again on September 24. R. 772–75. She continued to complain of pain in her right posterolateral hip, although Dr. Lewis noted that her recent MRI was essentially unremarkable. R. 772–73. She also complained of intermittent pain in her lower back. R. 773. Howells reported that she had started physical therapy, but could not tolerate the standing exercises. *Id.* She had recently restarted prednisone out of concern for possible adrenal insufficiency, but this did not help her joint pains. R. 772–73. She also reported that her breathing had gotten worse again and that she was using a nebulizer more. R. 772. Findings on physical examination were unchanged from her previous visit. R. 774–75. Dr. Lewis again described Howells's arthritis as being under fair control and expressed suspicion that her current joint complaints were not inflammatory in nature. R. 775. She continued Howells on Enbrel and reinitiated a trial of Neurontin. *Id.*

On November 26, Howells informed Dr. Lewis that she was experiencing increased pain and stiffness in her knees, hands, and ankles. R. 746–49. She continued to complain of pain in her hip and stated that it had locked when she rotated her leg while shaving. R. 746. She reported that her physical therapist was concerned that she was not responding to exercises. *Id.* Howells also complained of increased lower back pain, which was relieved with Flexeril, and tightness in her neck. *Id.* She experienced continued difficulty with her breathing, but Dr. Lewis noted that this was not unusual given the time of year. *Id.* Findings on examination remained unchanged. R. 748. Dr. Lewis remarked again that her arthritis was under fair control, and she suggested that Howells reduce her dose of Flexeril to avoid side effects, which Howells described as leaving her

16

"feeling drained." R. 746, 748–49. Howells was reluctant to follow this recommendation. Dr. Lewis also noted her suspicion that Howells's hip pain was radiating from her spine. R. 749.

The only recorded visit with Dr. Lewis following her completion of the medical opinion form was on October 14, 2013. R. 1203–06. Howells had recently held Enbrel because of elevated liver function tests and stated that she felt miserable without it, with increased symptoms in her hands, wrists, and ankles. R. 1203. She also still experienced pain in her right hip and difficulty breathing. *Id.* As in her previous visits, however, she exhibited grossly normal signs on examination. R. 1205–06. Dr. Lewis recommended continuing to hold Enbrel and stated that she would consider a new medication once Howells's liver function tests stabilized. R. 1206.

2. *Other Relevant Evidence*

At the same time Howells treated with Dr. Lewis for her arthritis, she also received treatment from other providers for her musculoskeletal and neurological conditions. Beginning in November 2010, after a fall dislocated and fractured her left shoulder, she engaged in physical therapy, which was highly effective in improving her pain, strength, and mobility, but which she ultimately discontinued as a result of her worsening lung condition. *See* R. 362–503. Medical follow-up for her shoulder produced generally unremarkable findings. R. 557–58, 672–74, 806–07, 818–23. Imaging showed that her injuries had healed and there were no degenerative changes or significant tissue damage. R. 558, 1073, 1078, 1085. Although she continued to complain of some mild symptoms of pain and stiffness, she responded well to injections. R. 807.

Regarding her back pain, the first major complaints in the record occurred in November 2012,[12] when Howells noted burning sensations and tightness throughout her spine, which her doctors attributed to muscle spasms. R. 749–61. Thereafter, Howells treated occasionally with Ward Gypson, M.D., for her back and hip pain. R. 731–37, 1193–95, 1224–26. Dr. Gypson

---

[12] A bypass surgery with lumbar fusions at L4, L5, and S1 had been performed in 2001. R. 750.

17

noted tenderness and limited range of motion of the lower back and normal findings in the lower extremities. R. 737, 1194, 1225. Imaging of the lumbar spine showed surgical changes without complicating features and some mild to moderate stenosis, but no other significant findings. R. 1057, 1180. Howells gained some modest relief from physical therapy, use of a TENS unit, and injections, although administration of injections to the lumbar spine was somewhat complicated by visualization difficulties caused by her fusion hardware. R. 1193, 1224. Robert Kime, M.D., an orthopedist, felt that imaging of Howells's lower back showed no more than mild residual nerve compression and did not indicate a surgical fix, and he recommended weight loss and activity modification. R. 1272.

Howells was evaluated for balance difficulties by Glenn E. Deputy, M.D., in February 2014. R. 1335–37. Dr. Deputy observed some abnormal signs on examination, including some tenderness over the occipital nerves, ataxic gait with a positive Romberg, hyporeflexia in the upper and lower extremities, and some diminished vibratory sensation in the lower extremities. R. 1337. An electromyogram and nerve conduction velocity study, however, showed no significant generalized polyneuropathy, no evidence of diffuse myopathy, and essentially no findings that would explain Howells's symptom complex. R. 1334.

      3.      *Analysis*

Howells argues that it was improper for the ALJ to discredit Dr. Lewis's opinion and instead suggests that this opinion was owed greater weight because Dr. Lewis was a treating provider. *See* Pl. Br. 17–27. The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A treating physician's opinion "is entitled to controlling weight if it is well-supported by medically

18

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Conversely, opinions from non-treating sources are not entitled to any particular weight. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ may reject a treating physician's opinion in whole or in part if there is "persuasive contrary evidence" in the record. *Hines*, 453 F.3d at 563 n.2; *Mastro*, 270 F.3d at 178. The ALJ must "give good reasons" for discounting a treating physician's medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Furthermore, in determining what weight to afford a treating source's opinion, the ALJ must consider all relevant factors, including the relationship—in terms of length, frequency, and extent of treatment—between the doctor and the patient, the degree to which the opinion is supported or contradicted by other evidence in the record, the consistency of the opinion with the record as a whole, and whether the treating physician's opinion pertains to his or her area of specialty. *Id.*

     Here, the ALJ explained that he rejected Dr. Lewis's opinion because it was inconsistent with the record as a whole and Dr. Lewis's treatment notes in particular, as these notes reflected conservative treatment and limited findings on examination. R. 30. He observed that the opinion seemed to reflect Howells's subjective reports of her symptoms, rather than objective findings. *Id.* These are sufficient reasons for the ALJ to give the opinion little weight, and his characterization of the evidence is consistent the record. With regard to Howells's breathing and musculoskeletal pain—the primary functional areas Dr. Lewis addressed in her opinion—Dr. Lewis's own treatment notes consistently reflect unremarkable imaging and examination findings in contrast to Howells's more serious subjective complaints. Dr. Lewis's opinion does not explicitly parrot Howells's report of symptoms, but she provided no explanation for the

19

limitations set forth in her opinion, instead submitting a checkbox form without comment. Although the ALJ did not specifically note this as a reason for rejecting the opinion, judges in this District have recognized that medical opinions completed on checkbox forms, with no written explanation of the reasoning underlying the opinion, are of limited probative value. *See Shelton v. Colvin*, No. 7:13cv470, 2015 WL 1276903, at *3 (W.D. Va. Mar. 20, 2015) (collecting cases). Rather, the regulations emphasize that greater weight is due to those opinions that are well supported and consistent with the record. These factors greatly undermine any presumptive weight to which Dr. Lewis's opinion might have been entitled on account of her being a treating source. I therefore find that the ALJ's rejection of this opinion is supported by substantial evidence.

## IV. Conclusion

For the foregoing reasons, I find that the Commissioner's decision to deny Howells's applications for disability benefits is supported by substantial evidence. Accordingly, the Court will **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 17, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket. A separate order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: March 31, 2017

Joel C. Hoppe
United States Magistrate Judge